IN THE

**United States Court of Appeals
for the District of Columbia Circuit**

NOVARTIS PHARMACEUTICALS CORPORATION,
*Plaintiff-Appellant,*

v.

XAVIER BECERRA, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL.,
*Defendants-Appellees,*

and

MSN PHARMACEUTICALS INC., ET AL.,
*Intervenor-Appellees.*

On Appeal from the United States District Court
for the District of Columbia, No. 24-cv-02234
Before the Honorable Dabney L. Friedrich

**MSN'S OPPOSITION TO EMERGENCY MOTION FOR
ADMINISTRATIVE STAY AND STAY PENDING APPEAL**

CHAD LANDMON (D.C. Bar No. 990347)
SUZANNE BASSETT (D.C. Bar No. 888314688)
1401 Eye ("I") Street, N.W., Suite 800
Washington, DC 20005
(202) 783-3300
Fax: (202) 783-3535
clandmon@polsinelli.com
sbassett@polsinelli.com

COREY CASEY (pro hac forthcoming)
900 W. 48th Place, Suite 900
Kansas City, MO 64112
(816) 753-1000
Fax: (816) 753-1536
ccasey@polsinelli.com

August 17, 2024

*Attorneys for MSN Pharmaceuticals Inc.*
*and MSN Laboratories Private Limited*

# TABLE OF CONTENTS

Certificate of Parties, Rulings, and Related Cases ................................................... 1

    A.    Parties ........................................................................................ 1

    B.    Rulings Under Review ............................................................ 1

    C.    Related Cases .......................................................................... 2

Glossary ........................................................................................................ 3

Introduction .................................................................................................. 4

Argument ...................................................................................................... 5

    I.    Novartis has not shown that it will suffer irreparable harm ................ 6

        A.    The district court did not commit clear error in its irreparable harm determination .................................................. 7

        B.    Any economic loss that Novartis may allegedly suffer is overstated ................................................................................. 9

        C.    Reputational harm and loss of goodwill ................................. 12

        D.    Research and development ...................................................... 13

    II.    Novartis is not likely to succeed on the merits. ................................. 13

        A.    FDA has broad authority to approve generic drug labels that carve out protected indications .......................................... 14

        B.    Novartis is unlikely to succeed in its request for a court to overturn fda's scientific conclusions as to safety .................... 20

    III.    The balance of hardships mitigates against the extraordinary relief sought by novartis. ................................................................... 23

    IV.    A Stay is against the public interest ................................................... 24

Conclusion .................................................................................................... 25

Certificate of Compliance ............................................................................ 26

Certificate of Service ..............................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Astellas Pharma U.S., Inc. v. FDA*,
  642 F Supp. 2d 10 (D.D.C. 2009)......................................................................10

*In re Barr Labs, Inc.*,
  930 F.2d. 72 (D.C. Cir. 1991)............................................................................11

*Boivin v. US Airways, Inc.*,
  297 F. Supp. 2d 110 (D.D.C 2003)......................................................................6

*Bristol-Myers v. Shalala*,
  923 F. Supp. 212 (D.D.C. 1996)..........................................................6, 8, 10, 14

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
  566 U.S. 399, 132 S.Ct. 1670, 182 L.Ed.2d 678 (2012) ...................................11

*Chaplaincy of Full Gospel Churches v. England*,
  454 F. 3d 290 (D.C. Cir. 2006)......................................................................5, 10

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)............................................................................................16

*Cytori Therapeutics, Inc. v. Food & Drug Admin.*,
  715 F.3d 922 (D.C. Cir. 2013)......................................................................16, 18

*Endo Par Innovation Co., LLC v. Becerra*,
  No. 24-cv-999 (TJK), 2024 WL 2988904 (D.D.C. June 10, 2024).....................7

*In re Entresto (Sacubitril/Valsartan) Pat. Litig.*,
  No. 20-md-2930, 2024 U.S. Dist. LEXIS 143344 (D. Del. August
  12, 2024) .......................................................................................6, 18, 19

*Experience Works, Inc. v. Chao*,
  267 F. Supp. 2d 93 (D.D.C. 2003)...................................................................6, 7

*Friedman v. FAA*,
890 F.3d 1092 (D.C. Cir. 2018) ..........................................................18

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564, 102 S. Ct. 3245, 73 L. Ed. 2d 973 (1982) ...................14

*Gulf Oil Corp. v. Dept. of Energy*,
514 F. Supp. 1019 (D.D.C. 1981)..........................................................6

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024)........................................................................16

*Meade Johnson Pharm. Group v. Bowen*,
655 F. Supp. 53 (D.D.C. 1986), *aff'd* 838 F.2d 1332 (D.C. Cir.
1988) ....................................................................................................9

*Mylan Lab'ys Ltd v. FDA*,
910 F. Supp. 2d. 299 (D.D.C. 2012)......................................................8

*Mylan Pharms., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000)...........................................................8

*Novartis Pharms. Co. v. MSN Pharms., Inc.*,
No. 1:22-cv-01395, 2024 WL 3756787 (D. Del. Aug. 12, 2024) ...............4, 5, 6

*Pharm. Mfg. Research Servs. v. FDA*,
957 F.3d 254 (D.C. Cir. 2020)......................................................16, 18

*Pharmacia & Upjohn Co. v. Ranbaxy Pharms. Inc.*,
274 F. Supp. 2d 597 (D.N.J. 2003)......................................................19

*Premo Pharmaceutical Laboratories, inc. v. United States*,
629 F.2d 795 (2nd Cir 1980) ...............................................................16

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)......................................................................10, 16

*Takeda Pharms. USA, Inc. v. W.-Ward Pharm. Corp.*,
785 F.3d 625 (Fed. Cir. 2015) .............................................................12

*Trustees of IAM Nat'l Pension Fund v. M & K Emp. Sols.*,
LLC, 92 F.4th 316 (D.C. Cir. 2024) .....................................................12

*Trustees of IAM Nat'l Pension Fund v. Ohio Magnetics, Inc.*,
656 F. Supp. 3d 112 (D.D.C. 2023) .................................................................12

*Washington Metro. Area Transit Comm 'n v. Holiday Tours, Inc.*,
559 F.2d 841, 843 (D.C. Cir. 1977) .................................................................5

*Watson Lab'ys, Inc. v. Sebelius*,
No. 12-1333-ABJ, 2012 WL 13076147 (D.D.C. Oct. 23, 2012) .......................10

*Weinberger v. Bentex Pharmaceuticals, Inc.*,
412 U.S. 645 (1973) ........................................................................................16

*Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*,
473 F.3d 1239 (D.C. Cir. 2007) .......................................................................15

*Young v. Motion Pictures Ass'n of Am.*, Inc..
299 F.2d. 119, 121 (D.C. Cir. 1962) ................................................................6

## Statutes

21 U.S.C. §355(j)(2)(A)(iv) ...............................................................................11

21 U.S.C. § 355(j)(2)(A)(v) ...............................................................................11

21 U.S.C. § 355(j)(2)(A)(viii).................................................................11, 12, 13

FDCA ................................................................................................................19

Hatch-Waxman Act.....................................................................................11, 12

## Other Authorities

21 C.F.R. § 314.94(a)(8)(iv) ........................................................................12, 14

21 C.F.R. § 314.127(a)(7).............................................................................15, 17

Blake Brittain, *Novartis loses initial bid to block generic of best-
selling heart drug*, Reuters (August 12, 2024) ................................................9

D.C. Cir. R. 8(a)(1) ...........................................................................................5

H.R. Rep. No. 98-857, pt 1 (1984).....................................................................11

Pharmaceutical Technology (August 13, 2024),
https://www.pharmaceutical-technology.com/news/us-judge-
denies-initial-attempt-by-novartis-to-block-generic-entresto-
launch/?cf-view (reporting that a spokesperson for Novartis stated
"it is maintaining its financial guidance for 2024, as well as its
mid-term guidance of +5% sales CAGR for 2023-2038")...................................9

Robert Barrie, *US judge denies initial attempt by Novartis to block
generic Entresto launch* ........................................................................9

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28.1(a)(1), MSN certifies that:

## A.    PARTIES

1.    The following are parties in this Court:

    a.    <u>Plaintiff-Appellant:</u> Novartis Pharmaceuticals Corporation.

    b.    <u>Defendant-Appellees:</u> Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services, and Robert M. Califf, in his official capacity as the Commissioner of the Food and Drug Administration.

    c.    <u>Intervenor-Defendants:</u> MSN Pharmaceuticals Inc. and MSN Laboratories Private Ltd.

2.    For purposes of Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Intervenor-Appellees MSN Pharmaceuticals Inc. and MSN Laboratories Private Limited certify that:

    a.    MSN Pharmaceuticals Inc. is wholly owned by MSN Laboratories Private Limited; and

    b.    MSN Laboratories Private Limited is privately held and no public entity owns 10% or more of its stock.

## B.    RULINGS UNDER REVIEW

Plaintiff-Appellant appeals an order and memorandum opinion issued on August 13, 2024, by District Judge Dabney L. Friedrich, ECF Nos. 22, 23. This

order and opinion denied Plaintiff-Appellant's Motion for Temporary Restraining Order and/or Preliminary Injunction (ECF No. 3).

C.    **RELATED CASES**

MSN is not aware of any related cases as that term is defined in Circuit Rule 28(a)(1)(C).


*/s/ Chad Landmon*
Chad Landmon
*Counsel for MSN Pharmaceuticals Inc. and MSN Laboratories Private Limited*

# GLOSSARY

ANDA      Abbreviated New Drug Application

FDA       Food and Drug Administration

FDCA      Food, Drug, and Cosmetic Act

MSN      Intervenor-Appellees MSN Laboratories Private Limited and its U.S. regulatory agent MSN Pharmaceuticals Inc.

NDA      New Drug Application

Novartis   Plaintiff-Appellant Novartis Pharmaceuticals Corporation

## INTRODUCTION

Having failed to obtain a temporary restraining order or a preliminary injunction from two separate district courts that each found that Novartis has not established irreparable harm, Novartis now seeks the extraordinary relief of an emergency motion to block MSN from bringing their generic sacubitril/valsartan tablets to market in order to extend Novartis's monopoly over its billion-dollar ENTRESTO product. But, Novartis does not – and cannot – demonstrate that the District Court committed clear error in finding that none of Novartis's theories of irreparable harm "rise to such imminence and severity as to meet this Circuit's 'high bar' for the 'extraordinary remedy' of preliminary injunctive relief." A7. This Court should not take the exceptional step of imposing an emergency stay of MSN's approval given the District Court's well-reasoned conclusion of no irreparable harm, which mirrored the same conclusion reached by the U.S. District Court for the District of Delaware in related patent cases. *Novartis Pharms. Co. v. MSN Pharms., Inc.,* No. 1:22-cv-01395, 2024 WL 3756787, at *3-*4 & n.9 (D. Del. Aug. 12, 2024).

As it must do in order to obtain an emergency injunction from this Court, Novartis next attempts to argue that it demonstrated a likelihood of success on the merits. Like the District Court, however, this Court need not even consider the merits because Novartis's failure to establish irreparable harm alone warrants denial of its emergency motion. But, even considering the merits, Novartis has not established a

likelihood of success but instead attempts to contort the governing statute and regulations in such a way as to prevent FDA from doing what it has always done – allow generic manufacturers to remove indications from their labels that brand companies contend are covered by patents. Not only do the statute and regulations fully support FDA's decision with respect to MSN's ANDA, but any other result would be contrary to Congressional intent in adopting "skinny labeling" as part of the Hatch-Waxman regime to promote generic drug competition and reduce overall drug prices.

Finally, Novartis fails to account for the harm to MSN that will result from a delay in market entry and the public interest in obtaining access to a less expensive generic version of ENTRESTO. The District Court never addressed these issues given its dispositive finding of no irreparable harm. But, the Delaware Court did evaluate these issues and came to the proper conclusion that these factors do not support Novartis's request for a preliminary injunction. *Novartis Pharms. Co.*, No. 1:22-cv-01395, at *9. When such factors are properly considered and balanced, this Court should deny Novartis's Emergency Motion.

## ARGUMENT

A request for an administrative stay requires the moving party to show it is likely to "prevail on the merits" of its request, the "prospect of irreparable injury" is substantial, there is comparatively little "possibility of harm" to the adverse parties,

and the "public interest" favors maintaining the status quo. D.C. Cir. R. 8(a)(1). A motion for a stay pending appeal is governed by the same factors. *Washington Metro. Area Transit Comm 'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). The District Court contained its analysis to irreparable harm because the failure to show a likelihood of irreparable harm is sufficient to defeat a motion for a preliminary injunction "even if the other three factors entering the calculus merit such relief." A6, citing *Chaplaincy of Full Gospel Churches v. England*, 454 F. 3d 290, 297 (D.C. Cir. 2006).

## I. NOVARTIS HAS NOT SHOWN THAT IT WILL SUFFER IRREPARABLE HARM

In order to obtain the extraordinary relief that it seeks in its motion, Novartis would have to carry the heavy burden of demonstrating that the District Court committed clear error in finding no irreparable harm. Simply put, Novartis has failed to carry that burden, and that should be the end of this Court's analysis.

Novartis advanced three theories of irreparable harm, none of which the District Court found arose to such imminence and severity as to meet this Court's "high bar" for the "extraordinary remedy" of emergency relief. A7; *See also Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) ("[t]he *sine qua non* of granting any preliminary injunctive relief is a clear and convincing showing of irreparable injury to the plaintiff"); *Bristol-Myers v. Shalala*, 923 F.

Supp. 212, 220 (D.D.C. 1996). Novartis has similarly failed to demonstrate that it is entitled to such extraordinary relief from this Court. A7-8.

### A. THE DISTRICT COURT DID NOT COMMIT CLEAR ERROR IN ITS IRREPARABLE HARM DETERMINATION

Two district courts in three cases have rejected Novartis's claims that it will face irreparable harm in the absence of an injunction. A7; *Novartis Pharms. Co.*, No. 1:22-cv-01395, at *3-*4; *In re Entresto (Sacubitril/Valsartan) Pat. Litig.*, No. 20-md-2930, 2024 U.S. Dist. LEXIS 143344, at *8-11 (D. Del. August 12, 2024). The decision to deny a request for preliminary injunction based on a finding of no irreparable harm, however, is only reversible if the lower court committed clear error. *See Young v. Motion Pictures Ass'n of Am.*, Inc. 299 F.2d. 119, 121 (D.C. Cir. 1962) (holding "the general rule [is] that denial of a preliminary injunction will not be set aside on appeal unless the District Court's action constitutes clear error or abuse of discretion[] and ordinarily this court will not consider the merits of the case further than necessary to determine whether that discretion was abused."). Novartis does not even come close to overcoming this high hurdle.

Novartis claims that ENTRESTO would experience "a dramatic loss of sales," "market volume," and "devastating losses." Mot. 10. As the District Court properly found, however, courts in this Circuit have been clear that none of these alleged harms withstand scrutiny to constitute irreparable harm. *Boivin v. US Airways, Inc.*, 297 F. Supp. 2d 110, 118 (D.D.C 2003); *Bristol-Myers*, 923 F. Supp. at 220. Even

irrecoverable economic loss does not rise to the level of irreparable harm unless the financial injury is so great as to "cause extreme hardship to the business, or even threaten destruction of the business." *Gulf Oil Corp. v. Dept. of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981); *Experience Works, Inc.*, 267 F. Supp. 2d at 96 (finding that $21.1 million reduction in funding is a serious financial blow, but one frequently faced by other similar entities, and not an economic loss that threatens the survival of the business).

Further, the District Court expressed its skepticism over Novartis's characterization of many of its potential harms. For example, Novartis maintains that, once MSN's product launches, "it will be impossible for Novartis ever to regain the status quo." Mot. 9, citing *Endo Par Innovation Co., LLC v. Becerra*, No. 24-cv-999 (TJK), 2024 WL 2988904, at *8 (D.D.C. June 10, 2024) (finding irreparable harm from market entry). The District Court was unpersuaded by this argument, however, distinguishing the facts of this case from *Endo Par*. Unlike in *Endo Par*, where the brand-name drug had one direct competitor that would remain on the market even if the generic were later removed, MSN's drug is the *only* generic sacubitril/valsartan currently positioned to enter the market. As the District Court pointed out, "[i]f MSN's generic were introduced and later removed, ENTRESTO would resume its dominant market position as the only medication of its kind available to chronic heart failure patients." A11. The court also found Novartis's

concerns over potential price erosion – whereby Novartis lowers its price to compete with MSN or other generics – are entirely speculative. Contrary to *Endo Par*, where the plaintiff provided concrete figures on price reduction projections, the District Court distinguished that "Novartis [] offers no evidence or projections suggesting that it *actually* plans to lower ENTRESTO prices." A11.

The evidence and arguments before this Court are no different. There is no reason for the Court to disturb the findings below, and Novartis certainly has not established clear error.

### B. ANY ECONOMIC LOSS THAT NOVARTIS MAY ALLEGEDLY SUFFER IS OVERSTATED

Novartis claims that Entresto would experience a "dramatic loss of sales in the weeks following generic entry," claiming that branded products tend to lose between 85-90% of their market volume within the first three months of generic entry. Mot. 10. But, the District Court was "unpersuaded that Novartis's market share loss will be as high as it anticipates, particularly given the short time frame in which the Court will address the merits of this case." A9. Novartis again has not demonstrated that such finding was clearly erroneous.

Without demonstrating clear error, Novartis argues here that its harm "stems from unique factors surrounding ENTRESTO" and that MSN and the District Court's reliance on projected losses related to market entry of other generic products have no bearing on this case. Mot. 11. But, as the District Court found:

> Even if the Court *were* to credit Novartis's worst-case-scenario, its projected loss of sales still would not constitute irreparable harm. The loss of 90% of ENTRESTO's sales revenue would amount to only a 5.7% loss in Novartis's total global revenue over a three-month period, based [on] the numbers from Novartis's public filings.

A10 (emphasis in original; citations omitted). The District Court was correct that such a loss does not meet the high standard for emergency injunctions. *Mylan Lab'ys Ltd v. FDA*, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) ("Monetary loss, even irretrievable monetary loss, may constitute irreparable harm only if it is so severe as to cause extreme hardship to the business or threaten its very existence.").

Novartis exaggerates that "[u]nlawful entry of MSN's purported generic product. . . will fundamentally and irretrievably affect the market . . . [and] Novartis expects that insurers would either drop ENTRESTO to a lower tier or remove it entirely . . . [making] ENTRESTO unavailable to many patients." Mot. 10-11. Courts within the Circuit have refused to award emergency relief based on assertations about lost opportunities and market share, and Novartis's argument that ENTRESTO will be dropped completely by insurers is mere speculation. *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000); *see also Bristol-Myers Squibb Co.*, 923 F. Supp. 212 (D.D.C. 1996) (characterizing as "mere speculation" pioneer drug maker's claim that the approval of generic drug would encroach on pioneer's market share); *Meade Johnson Pharm. Group v. Bowen*, 655 F. Supp. 53, 56 (D.D.C. 1986) (finding that purported loss in market share was "pure speculation"), *aff'd* 838 F.2d

1332 (D.C. Cir. 1988). The District Court doing the same here is certainly not clear error.

Finally, Novartis's assertions of irreparable harm are belied by its own public statements. Specifically, multiple press reports following the denial of the preliminary injunction motions stated that Novartis has assured its investors that these decisions would not impact Novartis's financial projections. *See* Robert Barrie, *US judge denies initial attempt by Novartis to block generic Entresto launch*, Pharmaceutical Technology (August 13, 2024), https://www.pharmaceutical-technology.com/news/us-judge-denies-initial-attempt-by-novartis-to-block-generic-entresto-launch/?cf-view (reporting that a spokesperson for Novartis stated "it is maintaining its financial guidance for 2024, as well as its mid-term guidance of +5% sales CAGR for 2023-2038"); Blake Brittain, *Novartis loses initial bid to block generic of best-selling heart drug*, Reuters (August 12, 2024), https://www.reuters.com/business/healthcare-pharmaceuticals/novartis-loses-initial-bid-block-generic-best-selling-heart-drug-2024-08-12/#:~:text=Novartis%20said%20in%20a%20statmement,for%20comment%20on%20the%20decision (quoting a Novartis spokesperson stating that the company "maintains its financial guidance for 2024"). Clearly, Novartis cannot claim irreparable harm to its company while at the same time maintaining its current financial projections.

## C.  REPUTATIONAL HARM AND LOSS OF GOODWILL

The District Court raised a "serious question" to Novartis's allegations that the company would suffer reputational harm and irretrievable loss of goodwill among patients, physicians, and others. A13. Novartis's concerns over its reputational harm and loss of goodwill stem from its argument that FDA approved a label would cause "injuries or side effects" with "its confusing labeling and missing dosage instructions." Mot. 13. The District Court flatly rejected this argument, finding that FDA's decision on this point "thorough and well-reasoned" based on the FDA's "highly technical analysis" on issues squarely within the scope of its expertise. A13, citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). While the District Court did not rule on the merits of the case, the court was persuaded with FDA's "expert determination" that the MSN dosage carveout does not pose safety risks relevant to Novartis's claims of reputational harm and loss of goodwill.

Moreover, courts routinely reject such speculative allegations of reputational injury as insufficient to show irreparable harm. *See, e.g.*, *Bristol-Myers Squibb Co.*, 923 F. Supp., at 220-22; *Astellas Pharma U.S., Inc. v. FDA*, 642 F Supp. 2d 10, 23 (D.D.C. 2009). Here, Novartis's allegations of quality or safety issues associated with MSN's product are unfounded.

D.     **RESEARCH AND DEVELOPMENT**

Novartis suggests that a reduction in revenue from ENTRESTO could "potentially" jeopardize its research and development investments.  *See* Miller Decl. ¶ 32, 33.  Notably, Novartis does not assert that it will *actually* reduce its research expenditures if MSN enters the market. As stated by the District Court, this is nothing more than a "reframing of Novartis's arguments about economic loss," and such business decisions "simply reflect the downstream effects of decreased revenues from ENTRESTO," which does not arise to irreparable harm. A14-15, citing *Watson Lab'ys*, *Inc. v. Sebelius*, No. 12-1333-ABJ, 2012 WL 13076147, at *3 (D.D.C. Oct. 23, 2012). Again, Novartis has not shown that the District Court's finding was clearly erroneous.

## II.     **NOVARTIS IS NOT LIKELY TO SUCCEED ON THE MERITS**

Because it concluded that Novartis would not suffer irreparable harm on a 60-day clock to resolve the merits, the District Court did not reach the likelihood of success prong. Although finding a lack of irreparable harm is sufficient to deny Novartis's emergency motion, *Chaplaincy*, 454 F. 3d at 297, the motion should also be denied because Novartis has not demonstrated a likelihood of success on the merits.

A.    **FDA HAS BROAD AUTHORITY TO APPROVE GENERIC DRUG LABELS THAT CARVE OUT PROTECTED INDICATIONS**

FDA's approval of MSN's carved-out indication was well within the authority granted by statute and consistent with FDA's regulations, prior practice, and case law. In fact, allowing generic companies to carve out indications and other protected language from their labels in order to navigate patents or regulatory exclusivities is a long-established practice consistent with the Congressional purpose behind the Hatch-Waxman Act "to get generic drugs into the hands of patients at reasonable prices – fast." *In re Barr Labs, Inc.*, 930 F.2d. 72, 76 (D.C. Cir. 1991).

Starting with the statute, although generic drug labels typically match the labeling of their branded counterparts, Congress expressly authorized exceptions where "the new [ANDA] drug and the listed [brand] drug are produced and distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v).  One of the driving reasons for this allowance was Congress's desire to promote generic competition by "permit[ing] an ANDA [for a generic drug] to be approved for less than all of the indications for which the [branded] listed drug has been approved . . . ."  H.R. Rep. No. 98-857, pt 1, at 21 (1984). Congress thus designed the "same labeling" statutory requirements to allow label changes for products produced by generic companies that are different from the branded company and further specified that generic manufacturers can avoid the related Hatch-Waxman patent litigation by

submitting section viii statements under 21 U.S.C. § 355(j)(2)(A)(viii) instead of

Paragraph IV certifications under 21 U.S.C. §355(j)(2)(A)(iv). The use of so-called

"skinny" labeling has become a driving force in promoting generic competition and

lowering drug costs. *See Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S.

399, 405, 132 S.Ct. 1670, 182 L.Ed.2d 678 (2012) (noting that the Hatch-Waxman

Act's skinny-label provisions were enacted to "speed the introduction of low-cost

generic drugs to market"); *Takeda Pharms. USA, Inc. v. W.-Ward Pharm. Corp.*,

785 F.3d 625, 631-32 (Fed. Cir. 2015) (holding that a central purpose of the Hatch-

Waxman Act is to allow through the section viii carve out process, the sale of generic

drugs for unpatented uses).

Novartis improperly attempts to narrow the statutory language by arguing that

the "different manufacturer" statutory language only allows for changes relating to

identifying "a different manufacturer, product name, or company address." Mot. 18.

But Novartis can point to no statutory language that is so narrowly restrictive, and

such a construction would nullify the submission of section viii statements under 21

U.S.C. § 355(j)(2)(A)(viii). It is a cardinal rule of statutory construction, however,

that statutes should be construed as a whole and that a court should not construe one

statutory provision in such a way as to nullify another statutory provision. *Trustees*

*of IAM Nat'l Pension Fund v. Ohio Magnetics, Inc.*, 656 F. Supp. 3d 112, 136

(D.D.C. 2023), aff'd sub nom. *Trustees of IAM Nat'l Pension Fund v. M & K Emp.*

*Sols.*, LLC, 92 F.4th 316 (D.C. Cir. 2024). Yet, Novartis's construction of the "same labeling" statutory requirement would entirely render meaningless the section viii statutory provisions because it would not allow generic companies to carve any language from the brand label in order to avoid brand company patents.

Perhaps realizing that its statutory argument is not sufficient to nullify FDA's longstanding regulations, Novartis next argues that FDA's approval of MSN's skinny label violates FDA's own regulations. Mot. 19. But again, Novartis's interpretation of the regulations is too narrow and misconstrues the changes that FDA allowed MSN to make. Specifically, FDA's regulations permit labeling changes based on "the omission of an *indication or other aspect* of labeling protected by the patent . . . ." 21 C.F.R. § 314.94(a)(8)(iv) (emphasis added). Leaving out an approved indication is entirely permissible under FDA's regulations, and this is exactly what MSN did in changing its label.

MSN's label carves out Novartis's indication to treat a subset of patients that do not have reduced ejection fraction (i.e., HFpEF patients). However, the only feasible way for MSN to omit the protected language is by making minor attendant changes to the label. Under the current approved label for Entresto, Novartis's purportedly patent-protected indication (i.e., treatment of HFpEF patients) is incorporated into a generally-stated broader indication that also incorporates non-patent protected indications (i.e., treatment of patients with reduced ejection

fraction). Specifically, the Entresto label states that the product is indicated "to reduce the risk of cardiovascular death and hospitalization for heart failure in adult patients **with chronic heart failure."** A18 §1.1 (emphasis added). "Patients with chronic heart failure" encompasses both the treatment of patients that are within the purportedly patent-protected indication (i.e., HFpEF patients) as well those that are not (i.e., HFrEF patients). Therefore, MSN's label modifies the indication as follows: "to reduce the risk of cardiovascular death and hospitalization for heart failure in adult patients with chronic heart failure. **and reduced ejection fraction**. ~~Benefits are most clearly evident in patients with left ventricular ejection fraction (LVEF) below normal.~~" ANDA No. 213748. The bolded text is language that MSN was required to add to clarify that its ANDA product is not indicated for treating HFpEF patients but is instead limited to treating patients with HFrEF (i.e., reduced ejection fraction). The insert is a *de minimis* change for the sole purpose of carving out an indication that Novartis asserts is protected by its patents, which is expressly permitted by the section viii provisions under 21 U.S.C. § 355(j)(2)(A)(viii).

To prohibit this modification would create a precedent where any brand manufacturer could circumvent section viii statements entirely by carefully wording its indications. For example, instead of drafting a label to treat Pox A, Pox B, and Pox C (where Pox C is still protected under a patent), a manufacturer could draft an indication for "all Pox variants." Under Novartis's theory, a generic manufacturer

would be prohibited from submitting an indication for "all Pox variants, **except for Pox C**" or for "Pox A and Pox B" because it would require "adding" words or phrases to the label. Such an absurd result that is clearly contrary to Congressional intent should not be countenanced by the Court. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S. Ct. 3245, 3252, 73 L. Ed. 2d 973 (1982).

Relevant case law affirms FDA's authority to approve a generic drug manufacturer's carved out label without violating the same labeling requirement. For example, in *Bristol-Myers Squibb Co. v. Shalala*, this Court affirmed FDA's authority to approve indication carve-outs, holding that "the statute expresses the legislature's concern that a drug be safe and effective for each indication that will appear on its label; whether the label for the new generic lists every indication approved for use of the pioneer is a matter of indifference." 91 F.3d 1493, 1500 (D.C. Cir. 1996).

Novartis inaccurately summarizes the applicable statute, regulations, and case law in its assertion that labeling differences must take the form of "an *omission* of language." Mot 4. But, neither the statute nor regulations prohibit the addition of words or phrases as a method for "the omission of an *indication* . . . protected by the patent . . . ." 21 C.F.R. § 314.94(a)(8)(iv). To do so would conflict with Congress's intent to allow generic manufacturers to seek approval for a drug with fewer indications than the listed drug. If the Court accepts Novartis's assertion, the

company would be permitted to extend its monopoly solely because the only way to omit its protected indication is by adding words to the labeling to exclude the patent protected indication. Neither the text nor the spirit of the law is so restrictive.

As noted in FDA's response to Novartis's Citizen Petition, the agency has permitted the omission of an indication via a carveout where the only way to omit the protected indication was to add words. *See* A490. It was thus proper for FDA to do the same with respect to MSN's ANDA here in order for FDA to meet the requirement that an agency treat like situations alike. *Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

Novartis's argument that FDA approved MSN's label based on "discontinued labeling" is a red herring. Mot 17. MSN's label relied on Novartis's current label and carved out the protected indication (i.e., the HFpEF patient population) from the currently approved label. It just so happens that this carve-out matches language from a prior version of the label before Novartis obtained approval to treat the additional patient population. FDA's decision to approve MSN's ANDA label was thus well within the statutory and regulatory provisions, along with being consistent with FDA's prior determinations and Congressional purpose in lowering drug prices by allowing skinny labels.

## B. NOVARTIS IS UNLIKELY TO SUCCEED IN ITS REQUEST FOR A COURT TO OVERTURN FDA'S SCIENTIFIC CONCLUSIONS AS TO SAFETY

Novartis argues that FDA's approval of the carve out of the § 2.6 dosing information was unlawful because removal of this "critical safety instructions" renders MSN's drug product less safe and effective in contravention of 21 C.F.R. § 314.127(a)(7). Mot. 20-21. However, Novartis is the only party that views the carved-out § 2.6 dosing information as "critical safety instructions." Novartis seeks to have this Court second-guess FDA's scientific conclusions to the contrary in a manner that courts have consistently avoided.[1] The fact that Novartis happens to be unhappy with FDA's expert conclusions is not a sufficient reason to depart from this norm.

Courts recognize that evaluation of drug safety and efficacy is a highly factual inquiry, demanding a rigorous scientific evaluation, which FDA is best suited to undertake. *Weinberger*, 412 U.S. at 653-54 ("The determination whether a drug is generally recognized as safe and effective . . . necessarily implicates complex chemical and pharmacological considerations."); *Pharm. Mfg. Research Servs.*, 957

---

[1] *See, e.g., Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 654 (1973); *Pharm. Mfg. Research Servs. v. FDA*, 957 F.3d 254, 262 (D.C. Cir. 2020); *Cytori Therapeutics, Inc. v. Food & Drug Admin.*, 715 F.3d 922, 927 (D.C. Cir. 2013); *Premo Pharmaceutical Laboratories, inc. v. United States*, 629 F.2d 795, 803 (2nd Cir 1980).

F.3d at 262 ("[T]he court gives a high level of deference to the agency's scientific analysis . . . and must avoid unduly second-guessing those scientific judgments.").

As noted by the District Court, "[t]he Supreme Court has long recognized that agency judgments on technical issues within their scope of expertise are to be given persuasive weight based on their thoroughness and validity of the agency's reasoning." A12-13; *see also Skidmore*, 323 U.S. at 140; *Weinberger*, 412 U.S. at 653-54 ("Threshold questions within the peculiar expertise of an administrative agency are appropriately routed to the agency, while the court stays its hand."). The deference afforded these determinations predated *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and is therefore unaffected by the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).

As noted by the District Court, in evaluating whether MSN's carve out of the § 2.6 dosing regimen was permissible, FDA engaged in an analysis that was "highly technical . . . thorough and well-reasoned." A13. This analysis is set out exhaustively in FDA's 45-page response to Novartis's Citizens Petition. A455-499. In its analysis, FDA expressly concluded that "*the omission of the subsection 2.6 modified dosing regimen would not render [MSN's ANDA product] less safe or effective...*" A493 (emphasis added). After review of the scientific data underlying the § 2.6 dosing regimen, FDA concluded that it is "***unknown***" whether the § 2.6 dosing regimen is

21

any safer for ACE/ARB naïve patients because (i) both tested groups showed similar rates of adverse effects and (ii) the data was "not robust" and had limited "generalizability to truly naïve patients" because all tested patients were subjected to ACE/ARB dosing to determine tolerability prior to the study. A494.

Accordingly, in asking this Court to adjudicate the accuracy of FDA's analysis and conclusions summarized above, Novartis is asking the Court to (i) evaluate the adequacy of certain methodologies for clinical studies, (ii) determine how far scientific data in a particular patient population may be extended to apply to other patient populations, and (iii) draw scientific conclusions as to medical risk from clinical data. Perhaps even more shocking, Novartis is asking the Court to do that in an emergency proceeding without even having the benefit of FDA's administrative record or full briefing of the parties addressing that record.

Recognizing that this is an extreme request, Novartis tries to reframe the issue by arguing that FDA is not applying the correct standard. Mot. 21. Novartis argues that "the agency asserts that *there is no need for such patients to receive the 'safest and best-tolerated option*,'" which, if true, would be a departure from the "no less safe and effective" standard of §314.127(a)(7). *Id*. But, this argument represents multiple layers of obfuscation. First, FDA never characterized the modified dosing regimen as the "safest and best tolerated" option – those were Novartis's words, which FDA rejected. A494. Second, FDA has never said that "*there is no need for*

*patients to receive the safest and best tolerated option*." Again, these are Novartis's words. Mot. 21. What FDA actually stated is that it is "***unknown***" if the § 2.6 dosing regimen is the safest and best tolerated option, due to deficiencies in the supporting data. A494. Therefore, there is no "***scientific basis*** to conclude . . . that the standard Entresto dosing regimen puts such patients at greater risk of adverse reactions or that section 2.6 is 'critical' to ensuring safe and effective use." A494. Novartis has constructed this issue with "standard" out of whole cloth and is using it as a smokescreen for what it actually takes issue with – FDA's scientific conclusions as to the significance of the TITRATION data and the § 2.6 dosing regimen.

No matter how it is framed by Novartis, such a review of the scientific merits of FDA's determination is beyond the narrow scope of review for prohibited "arbitrary and capricious" behavior. *Friedman v. FAA*, 890 F.3d 1092, 1098-99 (D.C. Cir. 2018). Courts should not "step into the FDA's shoes and reassess its scientific judgments—a role that courts are ill-equipped to play under the guise of the APA's arbitrary and capricious standard." *Pharm. Mfg. Research Servs.*, 957 F.3d at 265; *see also Cytori*, 715 F.3d at 927. Novartis's motion should thus be denied.

## III. THE BALANCE OF HARDSHIPS MITIGATES AGAINST THE EXTRAORDINARY RELIEF SOUGHT BY NOVARTIS

Novartis contends that no other party would be harmed by a stay, Mot. 22, but that fails to account for the harm to MSN. As Novartis admits, it has entered into

settlement agreements with other generic companies that will permit them to launch their products upon entry by MSN. Mot. 12. These companies are likely preparing for an accelerated launch (triggered by an MSN launch at-risk) at this very moment, meaning that every day that MSN is prevented from entering the market is a day closer to when these other generic companies will be ready to launch their products, stripping MSN of any advantage of being the first and sole generic entrant. *In re Entresto (Sacubitril/Valsartan) Pat. Litig.*, No. 20-md-2930 at *12 ("I find the balance of equities does not favor enjoining MSN's launch.").

## IV.  A STAY IS AGAINST THE PUBLIC INTEREST

Granting Novartis's motion for a stay will also not further the public interest. "[T]he public has an interest in receiving the benefit of ANDA-approved generic drugs as soon as those products can lawfully come to market." *Pharmacia & Upjohn Co. v. Ranbaxy Pharms. Inc.*, 274 F. Supp. 2d 597, 614 (D.N.J. 2003), aff'd in relevant part, 85 F. App'x 205 (Fed. Cir. 2003).

Having MSN's generic on the market sooner, rather than being erroneously delayed, will lead to lower prices for patients and payors, which will benefit the public and satisfy the intent of the FDCA. *In re Entresto (Sacubitril/Valsartan) Pat. Litig.*, No. 20-md-2930 at *12 ("I also agree with MSN that the possible decrease in public awareness is likely outweighed by the increased accessibility and affordability of sacubitril/valsartan drugs that would result from generic

competition. I find the public interest factor favors denying injunctive relief.") (internal citations omitted).

## CONCLUSION

For all the above reasons, Novartis's emergency motion to stay FDA's approval pending a decision on the merits should be denied.

Dated: August 17, 2024

Respectfully submitted,

POLSINELLI PC

By:   /s/ Chad Landmon
    CHAD LANDMON (D.C. Bar No. 990347)
    SUZANNE BASSETT
    (D.C. Bar No. 888314688)
    1401 Eye ("I") Street, N.W., Suite 800
    Washington, DC 20005
    (202) 783-3300
    Fax: (202) 783-3535
    clandmon@polsinelli.com
    sbassett@polsinelli.com

    COREY CASEY (pro hac forthcoming)
    900 W. 48th Place, Suite 900
    Kansas City, MO 64112
    (816) 753-1000
    Fax: (816) 753-1536
    ccasey@polsinelli.com

    *Attorneys for MSN Pharmaceuticals Inc. and MSN Laboratories Private Limited*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2).

1.    Exclusive of the exempted portions of the document, as provided in Fed. R. App. P. 32(f), this document contains 4,961 words.

2.    The document has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


*/s/ Chad Landmon*
Chad Landmon

August 17, 2024

**CERTIFICATE OF SERVICE**

I certify that on August 17, 2024, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users. I further certify that I will serve the foregoing by email on counsel for the Government and MSN.

*/s/ Chad Landmon*
Chad Landmon